**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|                          |     |                           |
|--------------------------|-----|---------------------------|
| **ANNA M. HALL,**        | )   |                           |
|                          | )   |                           |
| **Plaintiff,**           | )   |                           |
|                          | )   | **No. 09 C 2114**         |
| **v.**                   | )   |                           |
|                          | )   | **Judge Joan H. Lefkow**  |
| **CITY OF CHICAGO,**     | )   |                           |
|                          | )   |                           |
|                          | )   |                           |
|                          | )   |                           |
| **Defendant.**           | )   |                           |

## OPINION AND ORDER

Plaintiff Anna M. Hall filed suit against the City of Chicago, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").  Before the court is the City's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  For the following reasons, the motion [#64] is granted.[1]

## BACKGROUND[2]

Hall is an African-American woman who worked as a plumber for the City of Chicago from August 1995 to May 2007.  This lawsuit arises from the treatment Hall received when she returned to work after a prolonged disability leave that lasted from 1999 to 2003.  As of September 2003, and at all times relevant to this case, Hall's primary medical restriction was that

---

[1] This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).  Venue is proper under 28 U.S.C. § 1391(b) because the parties reside in this district and the events that gave rise to Hall's claims occurred in this district.

[2] The facts set forth in this section are derived from the statements of fact and supporting documents submitted by the parties to the extent they comport with Local Rule 56.1.  They are taken in the light most favorable to Hall, the non-movant.

she could not lift more than twenty-five pounds.

## I.    Hall's Work in the House Drain Inspectors Division

On September 11, 2003 Hall met with Mary Jo Falcon, a deputy commissioner of personnel, who told Hall that the City had an open position that would accommodate Hall's medical restrictions.  Hall was then assigned to a light duty position in the House Drain Inspectors Division of the Department of Water Management (referred to herein as the "House Drain Inspectors Division" or the "Division").  Her supervisor in the House Drain Inspectors Division was Gregory Johnson, an African-American male.  There was one other female in the Division, who was Johnson's secretary.

Hall had filed a Title VII discrimination suit against the City in 1998.[3]  According to the deposition testimony of Robert Owens, one of the House Drain Inspectors under Johnson's supervision, there was "gossip around the district" regarding the lawsuit.  Pl.'s Ex. C at 75. Owens wasn't sure if he heard about Hall's lawsuit from Johnson or from another employee, but he was certain that the case was the subject of "general conversation" among the 300 or 400 employees who worked in the same building as the House Drain Inspectors.  *Id.* at 76.  Hall also had a pending discrimination charge with the Equal Employment Opportunity Commission ("EEOC") when she started her assignment in the Division.[4]

On September 16, 2003, Hall started work in the House Drain Inspectors Division.  Her

---

[3] Hall's suit alleged sex discrimination, retaliation, and failure to promote in violation of Title VII.  *See Hall* v. *City of Chicago*, No. 98 C 4682.  The court granted summary judgment for the City in March 2001.  *See Hall* v. *City of Chicago*, 152 F. Supp. 2d 962 (N.D. Ill. 2001).

[4] Hall filed a charge with the EEOC and the Illinois Department of Human Rights in July 2002, alleging race discrimination and retaliation.  The charge was dismissed for lack of substantial evidence in March 2004.

first assignment from Johnson was to alphabetize paperwork. Hall eventually came to believe that she was being asked to re-alphabetize the same papers over and over again. After she had been alphabetizing paperwork for about three weeks, Hall approached Johnson and asked if she could do "something a little bit more productive," such as accompany the House Drain Inspectors on site visits. Def.'s Ex. 3 at 88–89. Johnson told Hall that he would talk to his supervisor. Not long afterwards, Hall found a box of videotapes on her desk. Hall asked Johnson what she was supposed to do with the videos and he told her, "You figure it out. You are a plumber." *Id.* at 90. Hall watched the videos and "just started looking for things." *Id.* at 92. The videos showed sewer pipes that were clogged with fecal matter, sanitary napkins, and tampons. Hall took notes on the videos. Johnson never asked to review her notes or followed up with her about her work.[5]

The tapes that Hall reviewed were filmed from the inside of sewer pipes that run from residential toilets to the City's main sewer line (referred to as "house drains"). The tapes were filmed by private contractors when a House Drain Inspector was sent to a residence to investigate a house drain that was obstructed or damaged. After an inspector finished at the job site, he brought the video back to the office. A supervisor then reviewed the tapes to determine whether the inspector had correctly assessed the obstruction and whether the drain repairs qualified for reimbursement under the City's private drain program. Usually, inspectors did not review the tapes after they turned them in at the office. If, however, a supervisor reviewed the

---

[5] The City disputes Hall's version of events. According to Johnson, he told Hall that he would need her to review and document the contents of the videotapes as soon as she started working in the House Drain Inspectors Division. Johnson also testified that he gave Hall a form to fill out for each tape that she reviewed, and that she was instructed file the forms in a cabinet. At the summary judgment stage, however, the court construes the facts in the light most favorable to Hall.

video and did not understand what he saw, or questioned the inspector's report, the inspector might review the video again with the supervisor. Old tapes were stored in the office so that they could be referred to in case of a dispute about a particular job site. Johnson testified that the tapes that Hall reviewed came from the boxes of old tapes that had been stored in the office. He explained that Hall's review saved him time because he could refer to her notes when he needed to answer questions about an inspection.

A few days after Hall started working at the Division, Johnson asked her to leave a House Drain Inspectors meeting. He also instructed the House Drain Inspectors not to talk to her. After Hall had reviewed videos for about one month, Hall told Johnson that she thought she could use her skills as a plumber to do more productive work, such as schedule appointments for the House Drain Inspectors or explain inspection procedures to homeowners. Soon thereafter, Hall called the Personnel Division in the Water Department and requested a meeting with Falcon to discuss "the situation" with Johnson. Def.'s Ex. 3 at 100–01. Falcon arranged a meeting with Hall, John Zander, the Labor Relations Supervisor for the Department of Water Management, and two other supervisors in the Department of Water. At the meeting, Hall stated that Johnson had advised the other inspectors not to talk to her and excluded her from House Drain Inspector meetings. She also stated that she was not doing productive work and asked to be transferred to the Plumbing Division. Falcon accused Hall of being a "troublemaker" who had filed several lawsuits against the City and began to discuss "everything as far as [the] legal matters in [Hall's] personnel file." *Id.* at 109. Hall ended the meeting and then called her union to complain.[6]

---

[6] Again, the City disputes that Falcon called Hall a "troublemaker" or that Hall ended the meeting as a result of Falcon's comments.

On October 22, 2003, Hall filed an internal employment complaint with the City alleging that Johnson had harassed and discriminated against her on the basis of her sex.[7] On November 26, 2003, Hall filed a charge of sex and race discrimination with the Chicago Commission on Human Relations.[8] The complaint alleges that Johnson assigned her to do useless clerical tasks when she started work in the Division, excluded her from a department meeting on September 19, 2003, told other employees in the Division not to talk to her, and told her to review videotapes but never provided any instruction.

Hall's only assignment from October 2003 to approximately May 2005, when she was transferred to the Plumbing Inspection Division, was to review videos. Zander and Falcon both knew about the assignment and understood that it was Hall's light duty assignment under the City's "return-to-work" program that was aimed at reducing the large number of employees on duty disability. Hall, however, had "no idea" what she was looking for when she reviewed the tapes.[9] Thomas Cotton, one of the House Drain Inspectors, testified that Hall's "assignment . . . was like a non-assignment." Pl.'s Ex. D at 45. Cotton felt that Hall didn't "even [know] what she was looking at" and that she should have been doing office work rather than "sitting there watching videos that meant nothing to her." *Id.* Cotton conceded, however, that he didn't know

---

[7] The complaint was still pending when the other events that gave rise to this lawsuit occurred. It is not clear from the record how the complaint was resolved.

[8] The case was closed in May 2008 based on a finding of no substantial evidence.

[9] The City asserts that Hall's testimony cannot be correct because sometime in 2003 or 2004 she helped prepare a description of her job duties that stated that she was "[r]eviewing private drain program videotapes through observation of tapes." Def.'s Ex. 4 at 125. The description further states that "[a] licensed plumber will interpret what should be placed on a daily inspection report, perusal by supervisor." *Id.* Hall testified, however, that the description was typed by Johnson's secretary based on her handwritten notes. Hall wasn't sure whether the job description matched what she wrote down.

the purpose of Hall's assignment. Owens similarly testified that he assumed that Hall was watching the videos to "[k]ill time," although he didn't know what her official assignment was. Pl.'s Ex. C at 47.

During her tenure at the House Drain Inspectors Division, Hall was not allowed to participate in multiple House Drain Inspector meetings. Johnson testified that he wanted to make sure that Hall was not doing the work of a House Drain Inspector. Even though the plumbers and the House Drain Inspectors belong to the same union, Johnson thought the union would object if Hall, a plumber, was doing inspection work.

Hall testified that she heard Johnson tell the House Drain Inspectors "several times . . . not to talk to me, not to advise me about anything, because I was a plumber and they were not a plumber." Def.'s Ex. 3 at 76. Cotton similarly testified that Johnson told him not to talk to Hall and that he heard Johnson give the same instruction to other House Drain Inspectors, although he wasn't sure why. Johnson testified that he told the House Drain Inspectors that they were "not there to chat with Anna Hall" because he noticed that she was "sitting around chitchatting" and disrupting the work in the office. Def.'s Ex. 9 at 63–64.

More than once Hall heard Johnson say to other employees that he "ought to go postal on that woman sitting out there" or that he "out to slap that woman sitting out there." Def.'s Ex. 3 at 76–77. She understood Johnson to be referring to her.[10] When the other employees were out of the office, Johnson sometimes stared at Hall and appeared to be trying to intimidate her. In addition, during Hall's first months at the House Drain Inspectors Division, Johnson said "your

---

[10] Only Johnson and his secretary had a private office. The inspectors sat in a large adjacent room with several desks. Hall sat in the room with the inspectors when she reviewed the videotapes.

mother" when he walked past Hall. Hall considered "your mother" to be a provocative statement because "[i]n the black race, when you say a person, you say their mother, that's like provoking – there is going to be a fight." *Id.* at 129. After Hall complained to the union, Johnson stopped making this comment for about a month but then continued making the comment "off and on." *Id.* at 131.

Johnson made several specific comments that Hall considered to be offensive and humiliating. First, on January 21, 2004, Hall heard Johnson refer to a woman on "The Jerry Springer Show" as a "slut." Second, on January 28, 2004, while Hall and Owens were sitting at a table outside Johnson's office, Johnson yelled to Owens, "Owens, listen to this," and then said that he could "go postal on that woman out there," and, "If I hit that woman, I get five days." *Id.* at 162–63. Johnson also said that he "could slap that woman and get a promotion." *Id.* at 163. Hall filed a Violence in the Workplace report, a complaint with the police, and complained to her union about Johnson's comments.[11] Third, on February 4, 2004, Johnson called Hall "stupid" while she was in the hallway next to the restroom. Pl.'s Ex. 1 at ¶ 5. Fourth, on February 10, 2004, Johnson made "threatening remarks" to Hall and then "bumped" Hall "hard enough to touch [her]" but not hard enough to knock her down. Def.'s Ex. 3 at 148–51, 176; Def.'s Ex. 4 at 208–09. Hall called the police, the union, and her attorney to report this incident because Johnson had "tried to" bump her on other occasions. Fifth, on January 11, 2005, Johnson raised his hand and yelled "Get out!" when she was talking to Owens in the dispatch area of the office. Pl.'s Ex. A at ¶ 6.

_____

[11] At her deposition, Hall testified that Johnson's secretary, Tanya Cashaw, told her that Johnson's comments were directed towards Hall. The court will not consider Cashaw's statement because it is inadmissible hearsay.

## II. Hall's Application for the Plumbing Inspector and Plumbing Inspector in Charge Positions

Sometime in 2004, Hall applied for a Plumbing Inspector position. She interviewed for the position with Kevin Bush and Chief Plumbing Inspector Frank Bathauer. At the beginning of her interview, Hall instructed Bathauer and Bush not to ask about her prior lawsuits against the City. Bush and Bathauer then "apologized" to her and the interview continued without any mention of Hall's prior lawsuit or EEOC charges. Hall was not hired for the position. On December 28, 2004, Hall filed a charge with the EEOC alleging that she had been "denied promotions, transfers and the opportunity to fill in as Acting Foreman" because of her sex and in retaliation for having filed previous complaints against the City.

Sometime around May 2005, Hall transferred to the Plumbing Inspection Division and was assigned to assist the Plumbing Inspector in Charge by looking up plumbing codes, distributing dig sheets, and identifying water mains. Sometime in 2005, Hall applied for the Plumbing Inspector in Charge position in the Department of Buildings. Hall was required to take a written test as part of her application for this position. Hall was also interviewed by Bathauer, Bush, and Stanley Kaderbek, the Commissioner of Buildings for the Department of Buildings. Among the eleven applicants for the position, the interviewers ranked Hall last. Each interviewer scored the applicants according to a written evaluation form that considered the applicants' training, experience, communication skills, and technical knowledge. All of the other applicants for the position were Plumbing Inspectors or acting as Plumbing Inspector in Charge. Mario Olivella, a male plumber, was hired for the position. In his written evaluation of Olivella, Bathauer stated that Olivella had been his "right hand man throughout [his] tenure."

Hall filed a charge with the EEOC on May 9, 2005, alleging that the City discriminated

8

against her on the basis of her sex and retaliated against her for filing a complaint with the EEOC. The EEOC issued a notice of right to sue on January 16, 2009. Hall filed a timely complaint on April 7, 2009.

## SUMMARY JUDGMENT STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. *Id*. While the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), where a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id*. at 323. In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id*. at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

## DISCUSSION

### I.    Claims Relating to Hall's Work In the House Drain Inspectors Division

Hall asserts two theories of liability relating to Johnson's conduct in the House Drain

Inspectors Division.[12]  First, Hall claims that Johnson created a hostile work environment that constitutes sex harassment in violation of Title VII.  Second, Hall claims that her assignment to watch videotapes of house drain pipes and exclusion from meetings constitutes retaliation for having filed charges of discrimination under Title VII.

### A.      Timeliness of Hall's Allegations

Citing Title VII's statute of limitations, the City argues that many of Hall's claims are untimely.  Title VII provides that an EEOC charge must be filed within 300 days of the allegedly unlawful employment practice, *see* 42 U.S.C. § 2000e-5(e)(1), which in Hall's case means that any unlawful employment practice must have occurred on or after July 13, 2004.  The court's application of the statute of limitations depends on the type of unlawful employment practice alleged by the plaintiff.  Where the plaintiff asserts a claim based on discrete retaliatory or discriminatory acts, those acts that occurred outside the statutory time period are time-barred. *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 105, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).  Examples of discrete acts include termination, failure to promote, denial of transfer, or refusal to hire.  *Id.* at 114.  When a plaintiff asserts a hostile work environment claim, on the other hand, the court may consider acts that occurred outside the 300 day time period "so long as an act contributing to that hostile environment takes place within the statutory time period."  *Id.* at 105; *Turner* v. *The Saloon, Ltd.*, 595 F.3d 679, 684 (7th Cir. 2010).  The rationale is that a hostile work environment is one unlawful employment practice and therefore "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work

_____

[12] Hall's complaint asserts claims for sex discrimination (Count I) and retaliation (Count II) but does not make clear what specific facts are alleged in support of either claim.  This opinion addresses the theories of liability that Hall sets forth in opposition to the City's motion for summary judgment.

environment fall outside the statutory time period." *Morgan*, 536 U.S. at 117.

Applying these principles, Hall's claim that Johnson assigned her to watch videotapes and excluded her from meetings in retaliation for having filed a lawsuit against the City is time-barred. Hall received the videotape assignment in September or October of 2003 and was excluded from meetings beginning in September of 2003.[13]  Both of these decisions are separate employment actions subject to Title VII's statute of limitations.  *See Morgan*, 536 U.S. at 114 ("Each . . . retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'").  Moreover, Hall cannot take advantage of the continuing violations doctrine or equitable tolling because it is clear that she viewed these decisions as actionable in November of 2003, when she filed an internal complaint with the City and a discrimination complaint with the Chicago Commission on Human Relations on the basis of the same facts she alleges here in support of her retaliation claim.  *See Tinner* v. *United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002) ("[I]f the employee knew, or with the exercise of reasonable diligence should have known, that each act, once completed, was discriminatory, the employee must sue upon that act within the relevant statutory period.").

Hall contends that she may recover for these discrete discriminatory acts because they were also part of a hostile work environment.  This is clearly contrary to *Morgan*.  *See Pruitt* v. *City of Chicago*, 472 F.3d 925, 927 (7th Cir. 2006) ("That discrete acts may have been mixed with a hostile work environment does not extend the time; *Morgan*, which involved just such a mixture, shows as much."); *see also Beamon* v. *Marshall & Illsley Trust Co.*, 411 F.3d 854, 860

---

[13] Hall has not provided evidence regarding when she was excluded from other meetings, other than to state that she was excluded "multiple" times.

(7th Cir. 2005); *Lucas* v. *Chicago Transit Auth.*, 367 F.3d 714, 723–24 (7th Cir. 2004).  Discrete

discriminatory acts that occurred outside the statutory time period may be considered in

determining liability, but only insofar as they constitute evidence of a hostile work environment.

*Morgan*, 536 U.S. at 113 (noting that the statute does not "bar an employee from using prior acts

as background evidence in support of a timely claim.").  They cannot constitute an independent

basis for liability.

Hall may, however, bring a hostile work environment claim that refers to acts that

occurred outside the statutory time period provided that all of the acts are "part of the same

actionable hostile work environment practice."  *Lucas*, 367 F.3d at 724 (quoting *Morgan*, 536

U.S. at 120).  Hall alleges that Johnson ostracized her from the other employees in the House

Drain Inspectors Division by giving her a phony work assignment, excluded her from meetings,

directed other employees not to talk to her, and made abusive comments and threats.  The pre-

and post-limitations conduct was perpetrated by the same supervisor, involved the same type of

employment actions, and instances were not separated by a large gap in time.  *Cf. id.* at 727

(three year gap between alleged hostile acts indicated that they were not part of the same hostile

work environment).  Therefore, Johnson's allegedly harassing conduct was part of the same

hostile work environment practice.  *See Morgan*, 536 U.S. at 120 (acts were part of the same

hostile environment claim where the pre- and post-limitation incidents involved the same type of

employment actions, occurred relatively frequently, and were perpetrated by the same

managers).  The last incident that is relevant to Hall's hostile work environment claim occurred

on January 11, 2005, when Johnson yelled at Hall and told her to leave the office dispatch area.

Because this incident occurred within the 300 day statute of limitations for Hall's Title VII

claim, the court will analyze whether all of Johnson's allegedly offensive conduct, taken as a whole, created an actionable hostile work environment. *See Turner*, 595 F.3d at 685.

### B.    Exhaustion of Administrative Remedies

The City also argues that the court cannot consider any incidents that Hall cites in support of her hostile work environment claim that were not specifically cited in her EEOC charge. "Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC." *Sitar* v. *Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003); *Cheek* v. *W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994). A plaintiff may, however, proceed on a claim not explicitly set forth in a charge of discrimination "'if the claim is like or reasonably related to the EEOC charges,' and the claim in the complaint 'reasonably [could] be expected to grow out of an EEOC investigation of the charge.'" *Peters* v. *Renaissance Hotel Operating Co.*, 307 F.3d 535, 551 (7th Cir. 2002) (quoting *Harper* v. *Godfrey Co.*, 45 F.3d 143, 148 (7th Cir.1995)). This means that the EEOC charge and the complaint must "describe the same conduct and implicate the *same individuals*." *Cheek*, 31 F.3d at 501. Because employees often file an EEOC charge without the assistance of a lawyer, "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Id.*

Hall's EEOC charge, like her complaint, alleges that she was subjected to a hostile work environment. The charge alleges that Johnson screamed and yelled at Hall, directed threatening remarks and intimidating looks towards her, isolated her from the other employees in the House Drain Inspectors Division, and denied Hall a vacation day. In response to the City's motion for summary judgment, Hall further asserts that Johnson bumped into her, called her "stupid," said

that he wanted to "go postal" on her, and excluded her from meetings. The incidents that Hall

cites in support of her motion for summary judgment involve the same individual (Johnson) and

the same conduct (harassment). They are the types of incidents that one could reasonably expect

to be discovered during the course of an investigation into Hall's EEOC charge. The court will

not bar claims arising from these incidents for failure to exhaust administrative remedies.

### C. Hostile Work Environment Claim

Hall alleges that Johnson's conduct created a hostile work environment during the period

when she was assigned to the House Drain Inspectors Division. To establish a prima facie case

under this theory, Hall must show that (1) she was subject to unwelcome harassment; (2) the

harassment was based on her gender; (3) the conduct was severe or pervasive enough to create a

hostile work environment; and (4) there is a basis for employer liability. *Lapka* v. *Chertoff*, 517

F.3d 974, 983 (7th Cir. 2008). Sex harassment in violation of Title VII does not need to be

"verbal or physical conduct of a sexual nature" but, rather, can be harassment based on hostility

to the presence of women in the workplace. *See Oncale* v. *Sundowner Offshore Servs., Inc.*, 523

U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998); *Boumehdi* v. *Plastag Holdings, LLC*, 489

F.3d 781, 799 (7th Cir. 2007). In order to constitute a hostile work environment, the harassment

must be "so severe or pervasive as to alter the conditions of [the victim's] employment and

create an abusive working environment." *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 786,

118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (citation omitted). The harassment must be "both

objectively and subjectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so." *Id.* at 787. Courts determine what

is objectively offensive by looking at all of the circumstances, including "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787–88 (citation omitted). "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Mason* v. *S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000).

Hall has not established that Johnson's allegedly harassing conduct was directed at her on account of her gender or that it created a hostile work environment. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination . . . because of sex." *Oncale*, 523 U.S. at 80. Hall does not allege that she was the target of explicitly sexist comments, gendered epithets, or overtly sexist behavior. *Compare with Boumehdi*, 489 F.3d at 786 (supervisor told plaintiff that women did not belong in the pressroom and should work in flower shops, that plaintiff should do the cleaning because "that's what women are supposed to do," asked plaintiff whether she had a breast enlargement when she was pregnant, and told plaintiff that she should wear low cut blouses and shorter shorts); *Pucino* v. *Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112 (2d Cir. 2010) (plaintiff was routinely given less desirable work than male employees who had the same job title and was "constantly" told by her supervisors that she was a "bitch" and to "go fuck herself"). Nor does Hall allege that Johnson treated all women differently from men. *Compare with Smith* v. *Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) ("One method of demonstrating that harassment is based on sex is to provide evidence of discrepancies in how the alleged harasser treats members of each sex in a mixed-sex workplace."). Moreover, most of Johnson's conduct – stating "your mother," calling

Hall "stupid," yelling at Hall to leave the dispatch area, and referring to a woman on TV as a "slut" – was not sufficiently offensive or threatening to constitute a hostile work environment.

The core of Hall's claim is that Johnson gave her a "phony" work assignment and isolated her from the male employees because she could not attend House Drain Inspector meetings or talk to the House Drain Inspectors about her work. There is no indication that the nature of Hall's light-duty assignment reflects hostility towards women, however. To the contrary, the videos were filmed by male House Drain Inspectors and were reviewed, from time to time, by male House Drain Inspectors. The fact that male employees also reviewed the tapes undermines Hall's suggestion that the tapes were sexually offensive because they showed tampons and fecal matter. Moreover, the City's Personnel Division knew about Hall's assignment in the House Drain Inspectors Division and some employees, such as Zander, viewed it as an appropriate light-duty assignment. Hall complains that the assignment was never explained and was not useful, but this is not sufficient to establish harassment based on sex under Title VII. *See Hobbs* v. *City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009) ("No reasonable jury could conclude that being assigned duties that were part of one's job description . . . amount[s] to a hostile work environment.").

Hall relies heavily on the fact that there were no female House Drain Inspectors, but the skewed ratio of men to women in the House Drain Inspectors Division does not, on its own, lead to the inference that Hall was treated differently on account of her sex. *See Beamon*, 411 F.3d at 864 (plaintiff who was only black supervisor and was denied a promotion needed to demonstrate a connection between the allegedly unfair treatment and his race). Hall was a Plumber, not a House Drain Inspector, and Plumbers and House Drain Inspectors had different responsibilities

within the Department of Water.  Hall does not allege that she needed to attend the House Drain Inspectors meetings for professional reasons, even given her light-duty assignment to the Division.  Johnson, moreover, testified that the union would not have wanted Hall to do the work of a House Drain Inspector.  Therefore it is not reasonable to conclude that Hall's exclusion from the meetings constituted a form of harassment based on sex.  In addition, according to Hall's testimony, Johnson told the other House Drain Inspectors not to "advise [her] about anything[] *because* [*she*] *was a plumber* and they were not a plumber."  This suggests that the conduct Hall complains of was motivated by intra-union politics, rather than Hall's sex.

Taking the foregoing into account, Johnson's statements that he wanted to "go postal on that woman" and "slap that woman," and the "bump" incident, do not establish a hostile work environment.  Johnson's statements that he wanted to "go postal on that woman" and "slap that woman" were unprofessional and inappropriate, but they were made in the presence of other employees and were not, so far as the record discloses, accompanied by threatening conduct. They do not cross "the line that separates the merely vulgar and the mildly offensive from the deeply offensive and sexually harassing."  *Baskerville* v. *Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (quoting *Carr* v. *Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1010 (7th Cir. 1994)).   Nor has Hall shown that a reasonable woman would have felt threatened or abused on account of her sex after being "bumped" by Johnson.  While courts place great emphasis on whether there was an unwanted touching in analyzing hostile work environment claims, *see Turner*, 595 F.3d at 685–86 (discussing cases); *Patton* v. *Keystone*, 455 F.3d 812, 816 (7th Cir. 2006), Hall has simply alleged that Johnson "bumped" her on one occasion and that on other occasions Johnson "tried to" bump her.  Hall does not assert that Johnson bumped her

on an intimate body part, *cf. Patton*, 455 F.3d at 816, or that he touched her hard enough to knock her down. Indeed, the precise nature of Johnson's conduct is unclear. Under these circumstances, a reasonable jury could not conclude that the "bump" created an abusive working environment or even that it was based on Hall's sex. *See Patton*, 455 F.3d at 816 ("The mere existence of physical contact does not create a hostile environment. . . . It is very important to focus intently on the specific circumstances of physical harassment – a kiss is not necessarily just a kiss."). Finally, Hall states that Johnson made "threatening" statements and gave her "intimidating" looks, but fails to describe the statements or conduct in any detail. Hall cannot show that Johnson's conduct was objectively intimidating or threatening simply by labeling it as such. Because Hall has not established a prima facie case, the City's motion for summary judgment with respect to Hall's hostile work environment claim will be granted.

## II.     Failure to Promote to Plumbing Inspector In Charge

### A.     Hall's Claim Is Not Barred Because of the *Shakman* Settlement

Hall argues that the City's failure to promote her to Plumbing Inspector in Charge constituted discrimination on account of her sex and retaliation for having filed complaints and lawsuits alleging violations of Title VII.[14] The City responds that Hall's claims are barred by the doctrine of judicial estoppel because her position in this case repudiates certain facts she asserted when she participated as an unnamed class member in *Shakman* v. *Democratic Organization of*

---

[14] In her statement of material facts, Hall asserts for the first time that she was denied a promotion to Plumbing Inspector in 2004. Hall does not argue that this constituted an actionable employment decision and therefore the court has not considered this employment decision as part of Hall's retaliation claim. Moreover, because Hall failed to include any allegation regarding the 2004 promotion in her EEOC charge, she is barred from raising such a claim in these proceedings. *See Geldon* v. *S. Milwaukee Sch. Dist.*, 414 F.3d 817, 820 (7th Cir. 2005) (requirement that employee must exhaust administrative remedies means that EEOC charge must put employer on notice of each discrete act of employment discrimination, including each position that employee was not hired for).

*Cook County*, Case No. 69 C 2145. The City further argues that, even if the doctrine of judicial

estoppel does not apply, Hall released her Title VII claims as part of the *Shakman* settlement.

For the reasons that follow, neither contention has merit.

     *Shakman* concerned two consent judgments that were entered into by the City of

Chicago in 1972 and 1983 and which prohibited the City from basing certain employment

decisions on political considerations. In January 2006, eight additional plaintiffs filed a second

amended complaint that re-alleged the class action claims from the original *Shakman* complaint,

filed in 1971, and added, among other claims, an application to hold the City in civil contempt

for violation of the consent judgments. The court entered an agreed settlement order and accord

in March 2007. Pursuant to the accord, the court certified a class that included all past

employees and applicants for employment with the City. *See* Case No. 69 C 2145, Dkt. #601 at

2 & Ex. A. Class members who wished to file a claim against the City were required to submit a

claim form to the Shakman Decree Monitor for adjudication. *Id.* at 18–19. Hall submitted an

Accord Claim Form and, as part of her claim, alleged that the City failed to promote her to

Plumbing Inspector in Charge in 2005 because of political patronage. Def.'s Ex. 4 at

HALL00882 (Accord Claim Form). Hall received an award of $12,500 from the Shakman

Decree Monitor.

     The equitable principle of judicial estoppel bars litigants from "prevailing in one phase of

a case on an argument and then relying on a contradictory argument to prevail in another phase."

*Kimbrell* v. *Brown*, --- F.3d ----, No. 10-1029, 2011 WL 2674938, at *4 (7th Cir. July 11, 2011)

(quoting *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 662 (7th Cir. 2010)); *New Hampshire* v.

*Maine*, 532 U.S. 742, 749–50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001). The requirements for

application of the doctrine include (1) that the party's later position was "clearly inconsistent" with its earlier position; and (2) that the party persuaded a court to accept its earlier position. *New Hampshire*, 532 U.S. at 750–51; *Ezekiel* v. *Michel*, 66 F.3d 894, 904 (7th Cir. 1995). By agreeing to participate in the *Shakman* settlement, Hall certified that she believed she was "subject[] to political discrimination" when the City failed to promote her to Plumbing Inspector in Charge. *See* Def.'s Ex. 4 at HALL00882. Hall's position in this litigation, that she was denied the promotion in retaliation for her prior discrimination charges and on account of her sex, is not clearly inconsistent with her earlier position. In addition, it is not clear that Hall persuaded the *Shakman* court to accept her earlier position. Hall's *Shakman* claim asserts that the City failed to promote her to eight different positions, including Plumbing Inspector in Charge. Her claim was adjudicated by the Shakman Decree Monitor, whose findings are not publicly available. Based on this record, it is not possible to determine whether the Shakman Decree Monitor based Hall's award on the Plumbing Inspector in Charge decision or on one or more of the other positions that Hall referenced in her claim form. Therefore judicial estoppel does not bar Hall's claim.

It is also clear from the text of Hall's release form that she did not, as the City argues, release Title VII claims against the City as part of the *Shakman* settlement. Hall signed a release form that provides that she would release the City from any and all claims "that have been or could have been asserted in *Shakman* . . . and . . . arising out of employment decisions of any kind made by the City of Chicago with respect to Class Members . . . *and based on the claim that those employment decisions were impermissibly motivated by political considerations*." *Id.* at HALL00885 (Release Form) (emphasis added). Because Hall's Title VII suit is not based on the

claim that the City's decision not to promote her was based on impermissible political considerations, it does not fall within the scope of her *Shakman* release.

### B.        Claims For Sex Discrimination and Retaliation

As discussed above, Hall claims that the City's failure to promote her to Plumbing Inspector in Charge constituted discrimination on account of her sex and retaliation for filing discrimination complaints.  Hall may proceed either directly, by presenting direct and/or circumstantial evidence of discriminatory intent, or indirectly, by utilizing the burden-shifting method established by *McDonnell Douglas Corporation* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Under the direct method, Hall may prove her case through direct evidence (such as an admission by the decisionmaker that his actions were based on unlawful animus) or through circumstantial evidence, "i.e., evidence that allows a jury to infer intentional discrimination by the decisionmaker."  *Rogers* v. *City of Chicago*, 320 F.3d 748, 753–54 (7th Cir. 2003); *Alexander* v. *Wisconsin Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001).

Under the indirect method, Hall must first make out a prima facie case for discrimination by showing that (1) she is a member of a protected class, (2) she met the City's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not in the protected class were treated more favorably.  *See Scaife* v. *Cook Cnty.*, 446 F.3d 735, 739 (7th Cir. 2006).  The elements for a prima facie case of retaliation similarly require Hall to show that (1) she engaged in a protected activity, (2) she met the City's legitimate expectations, (3) she suffered a materially adverse action, and (4) she was treated worse than similarly situated employees who did not engage in the protected activity.  *Id.*  Once

Hall has established a prima facie case, the burden shifts to the City to provide "a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If the City provides a legitimate, nondiscriminatory reason for the employment action, the burden shifts back to Hall to demonstrate that the City's proffered reason is a pretext for unlawful discrimination or retaliation. *Id.* at 739–40.

Hall does not state whether she is proceeding under the direct or indirect method, but she fails to establish a prima facie case using either method of proof. Hall must rely on circumstantial evidence for her direct method claim, and would therefore need to show that the City's stated reasons for choosing Olivella – that he was Bathauer's "right hand man" and the evaluators' highest-rated applicant – were pretextual. Thus the question before the court is whether Hall "has provided evidence from which a rational trier of fact could infer that the [City's] stated reasons for taking the adverse action were lies." *Alexander*, 263 F.3d at 683. Hall first argues that the interviewers' rankings of the applicants must have been a "sham" because the interviewers did not list the applicants' written test scores on the evaluation forms and the City did not produce the written tests or answer sheets during the course of this litigation.[15] Hall, however, has not provided any evidence showing that the original written tests or answer sheets were not produced or destroyed in bad faith or for the purpose of hiding adverse information during the course of litigation. Therefore the court cannot draw an adverse inference based on the City's failure to produce the documents. *See Everett* v. *Cook Cnty.*, --- F.3d ----, 2011 WL 3691305, at *3 (7th Cir. Aug. 24, 2011); *Park* v. *City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002). Nor does Hall cite evidence to support the conclusion that the

---

[15] Perhaps because of her *Shakman* release, Hall does not argue that Olivella was selected because of political patronage

interviewers made affirmative misrepresentations on their evaluation forms.

Hall also argues that Bathauer and Bush must have acted with retaliatory animus because they knew that she had previously filed complaints against the City. At her deposition, Hall testified that when she interviewed for the Plumbing Inspector position she asked Bathauer and Bush not to ask her about the lawsuits during her interview and that the two men "apologized" to her before the interview continued. This testimony does not demonstrate that Bathauer or Bush viewed Hall's application negatively or that they were dishonest in their assessment of her application for the Plumbing Inspector in Charge position. Given that Hall has not presented evidence that might call the City's evaluation of her application into question, is not reasonable to infer that Bathauer and Bush lied about their reasons for hiring Olivella simply because they knew of her prior complaints against the City.[16]

Finally, Hall has not shown that the other employees who applied for the position were similarly situated, as is required under the indirect method of proof. A plaintiff must show that similarly situated employees were "comparable to the plaintiff in all *material* respects." *Crawford* v. *Indiana Harbor Belt Ry. Co.*, 461 F.3d 844, 846 (7th Cir. 2006). Although the similarly situated requirement is flexible, there must be enough evidence to perform a "meaningful comparison . . . one which serves 'to eliminate confounding variables, such as differing roles, performances histories, or decision-making personnel.'" *Argyropoulos* v. *City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (quoting *Humphries* v. *CBOS West, Inc.*, 474 F.3d 387,

---

[16] Hall also testified that at an unspecified time in 2004 she was told by an unidentified plumber, now deceased, that Bush and Bathauer had discussed Hall's lawsuits against the City "with everybody." The unidentified plumber's statement is hearsay. Hall does not argue that any exceptions to the hearsay rule apply, and therefore the court will not consider the statement as circumstantial evidence that Bush and Bathauer acted with retaliatory animus.

405 (7th Cir. 2007)).  Hall has not submitted any evidence regarding the job qualifications or performance history of the other candidates for the Plumbing Inspector in Charge position. Therefore there is no basis to conclude that the other applicants were similarly situated to Hall. Moreover, it is undisputed that the other applicants were either Plumbing Inspectors or Plumbing Inspectors acting as Plumbing Inspector in Charge.  Hall, on the other hand, had the job title of Plumber.  Given that the duties of the Plumbing Inspector in Charge include supervising the Plumbing Inspectors, the difference in job title might have been significant.  Hall does not address this issue.  In addition, with respect to her retaliation claim, Hall does not allege or cite evidence showing that the other employees who applied for the position had not engaged in activity protected under Title VII.  For the foregoing reasons, Hall has not met her burden of establishing that she has a prima facie case for discrimination based on sex or retaliation.  The City's motion for summary judgment with respect to Hall's claim for failure to promote to Plumbing Inspector in Charge will be granted.

## CONCLUSION AND ORDER

For the reasons discussed above, the City's motion for summary judgment [#64] is granted. The clerk is instructed to enter summary judgment in favor of the City.  This case is terminated.

Dated: Sept. 6, 2011                    Enter:_____

                                        JOAN HUMPHREY LEFKOW
                                        United States District Judge